UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DAVID LEON JOHNSON,

Petitioner,

vs.

JOSH TEWALT, Director of the Idaho Department of Correction; and CARMEN DYAS, Senior Probation Officer for Interstate Compact Parolees, also with the Idaho Department of Correction,

Respondents.

Case No. 1:18-cv-00216-DCN

**MEMORANDUM DECISION AND ORDER**

Petitioner David Johnson's remaining habeas corpus claims (One, Two, Three, and Five) are fully briefed and ripe for adjudication. Dkts. 1, 19, 23, 25. Claim Four was dismissed earlier on procedural default grounds. Dkt. 17.

The Court takes judicial notice of the records from Petitioner's state court proceedings lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Having carefully reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying the Petition for Writ of Habeas Corpus.

## BACKGROUND

The Idaho Supreme Court explained the background of the case as follows:

> David Leon Johnson, the appellant, was charged [by indictment] with three counts of lewd and lascivious conduct with a minor under sixteen pursuant to I.C. § 18–1508. He was charged for offenses he allegedly committed against his daughter, A.J., who was between six and seven years old at the time of the charged conduct. Mr. Johnson had a home in Paul, Idaho, with his wife and five children at the time. The first two counts allegedly occurred over the first weekend of spring break, 2004. Michelle Johnson, Mr. Johnson's wife at the time, purportedly took the couple's children to Utah to visit her parents but left A.J. behind with Mr. Johnson. A.J. testified that while she was home alone with Mr. Johnson, he molested her on two occasions. First, he allegedly touched and penetrated A.J.'s genitalia with his hands, made A.J. touch his penis manually until he ejaculated, and then forced her to lick chocolate off of his penis. Second, Mr. Johnson allegedly attempted to penetrate A.J. in the shower by lifting her up and onto his penis. The third count alleged that Mr. Johnson molested his daughter over the Memorial Day weekend of 2005.

State's Lodging B-4, pp. 1-2 (first direct appeal) (parenthetical added, *see* State's Lodging A-1, pp. 1-4).

The victim was seven when the molestation occurred, and nine, at an education level between second and third grade, when she first testified at trial in 2006. Her testimony contained details of sexual activity that a child that young would not have known. *See* State's Lodging A-7, pp. 759-772. For example:

> Q. Can you tell me what your dad's private was doing when he had you sit on it?
>
> A. Can I do it with my bunny's ear?
>
> Q. Okay.

> Ms. Cannon: Your Honor, I'll indicate for the record that the witness has held up her stuffed rabbit who has accompanied her to the witness stand, and using an ear, held one of the ears straight, sticking forward."
>
> The Court: The record will so reflect.

State's Lodging A-7, p. 772.

In the 2006 jury trial, Petitioner was convicted of two counts of lewd conduct and acquitted of the third count. State's Lodgings A-1, pp. 1-4; A-2, pp. 320-321. On direct appeal, the Idaho Supreme Court agreed with Petitioner that the trial court committed harmful error in admitting the testimony of Petitioner's sister that he had sexually molested her when he was a teenager. State's Lodging B-4. In 2010 the conviction was vacated and the case remanded for a new trial.

In 2011, a new trial was held. Petitioner's sister's testimony about past unrelated acts of molestation was not presented at the second trial. Petitioner again was found guilty of two counts of lewd conduct. State's Lodging E-3, p. 608. Petitioner was sentenced to two concurrent five-year fixed terms in prison, with ten years indeterminate. State's Lodging E-3, pp. 612-614.

Petitioner's counsel did not file a notice of appeal, and on post-conviction review Petitioner asserted ineffective assistance of counsel for the failure. The parties stipulated that Petitioner's direct appeal time should be re-opened. State's Lodging E-2, pp.77-79; 88-91. The state district court restored Petitioner's direct appeal rights by re-entering the judgment of conviction. *Id*. Petitioner's other post-conviction claims were summarily dismissed. State's Lodgings E-2, pp. 274-295.

Petitioner appealed the post-conviction rulings. State's Lodging E-2, pp.101-103, 359-363. His appeal was eventually dismissed for failure to file a pro se brief, after his counsel withdrew for lack of a viable issue for appeal. State's Lodging G-1 to G-4. Through counsel, Petitioner proceeded on his direct appeal. State's Lodgings F-1. The Idaho Supreme Court granted no relief. State's Lodging F-5.

Through newly-retained counsel, Petitioner filed this habeas corpus action. Petitioner raised five claims in his federal Petition for Writ of Habeas Corpus, of which four remain to be decided on the merits. Petitioner is now on parole but desires to continue to challenge his convictions.

## STANDARDS OF LAW

### A. AEDPA Deferential Review Standard

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a challenge to a state court judgment that addressed the merits of any federal claim. The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; to prevail, the Petitioner must show that the state court's application of federal law was objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). Stated differently, if fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

**B. De Novo Review Standard**

In some instances AEDPA deferential review under § 2254(d)(1) does not apply and

the federal district court reviews a claim de novo (anew). *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). As in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

**C. Harmless Error Standard**

Generally, even if a petitioner succeeds in demonstrating a constitutional error in the course of his conviction, he is entitled to federal habeas relief only if he "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted).

**D. Presumption of Correctness of State Court Findings of Fact**

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's factfinding or legal conclusions are incorrect

or wrong. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Pizzuto v. Yordy*, 947 F.3d 510, 530 (9th Cir. 2019).

On federal habeas review, the findings of fact of the state appellate court (and any state district court findings of fact not in conflict with state appellate court findings of fact) are entitled to AEDPA deference. *See James v. Ryan,* 733 F.3d 911, 916 (9th Cir. 2013) (noting that case law "does not require us to ignore a state court's explicit explanation of its own decision"); *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (we look "to the last reasoned decision" resolving a claim).

Accordingly, under §2254(e)(1), the Court presumes state court findings of fact are correct, unless the petitioner shows, by clear and convincing evidence, that the findings of fact are incorrect *and* unreasonable. In *Pizzuto v. Yordy*, the Ninth Circuit reiterated the high standard for such a showing:

> Under § 2254(d)(2), we may not characterize a state court's factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Brumfield*, 135 S. Ct. at 2277 (alteration in original) (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010)). "Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference." *Id*. "If '[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ... determination.'" *Id*. (alterations in original) (quoting *Wood*, 558 U.S. at 301, 130 S.Ct. 841).

947 F.3d at 530.

## DISCUSSION

### 1. Claim One

In Claim One, Petitioner asserts that the trial court's introductory comments during voir dire created implicit bias in the entire jury panel, and that the trial court's failure to grant Petitioner's motion to vacate the trial and empanel a new jury panel violated his Sixth and Fourteenth Amendment rights to due process and a fair trial. Dkt. 1; State's Lodging F-1.

After remand, the parties and the court met for a final pre-trial conference on June 6, 2011. Defense counsel Keith Roark requested that a jury questionnaire be used to aid in selecting the jury. Counsel submitted a proposed questionnaire to the court on June 7, 2011. On June 16, the district court entered a minute order regarding preliminary jury selection proceedings ("Minute Order") which informed counsel that the court would conduct "preliminary jury selection proceedings" and would "give verbal preliminary instructions and information about the charges in th[e] case" without the presence of counsel. State's Lodging F-5, p. 3.

The trial court attached a written copy of the court's intended verbal preliminary comments as Exhibit A to the Minute Order. Exhibit A, in part, addressed the prior trial with the following language: "There was a prior trial in this case in 2006. Following an appeal, the Idaho Supreme Court reversed and remanded the case to this court for a new trial." *Id*. Because defense counsel was not present during these hearings, no contemporaneous objection to the court's reading of the instruction was made. *See id*.

The Minute Order allowed the parties to object to the court's intended preliminary

comments by June 21. The Minute Order certificate of service indicates that it was served on counsel by facsimile on June 16. Defense counsel did not object to the proposed comments by June 21 or at all because he did not see the notice because he was conducting an out-of-town trial. *See id*. (It is unclear why Roark left his office, fax machine, and mailbox unattended while he was in trial.)

On June 22, 2006, the court summoned jurors to complete the questionnaires, gave them preliminary instructions, and read them the comments contained on Exhibit A. Neither counsel was present. *See id*.

Because defense counsel remained unaware of the introductory comments given to the jury, on June 27, 2006 (one week into voir dire), he filed a motion in limine to preclude the attorneys or witnesses from mentioning the prior trial and instead require them to say "previous hearing" if they needed to refer to the prior trial. *See* State's Lodging D-2, pp. 74-78. In camera, the Court, defense counsel, and the prosecutor, Lance Stevenson, had the following discussion:

> THE COURT: Back on record in chambers at 9:20 A.M. All counsel present.
>
> Mr. Roark, we took a quick look at your motion in limine, the essence of which is to seek that there be no mention made of the prior trial in this case. We crossed that bridge last week with both these -- with the supplemental questionnaires. I told the panels when they were in that there had been a prior trial; that on appeal, the Supreme Court had reversed and remanded the case to this Court for trial and that I was assigned to handle this case. So without meaning to and not

knowing that was your position, I went ahead and, I think -- did we make that disclosure in the proposed questionnaire?

MR. STEVENSON: The proposed jury instructions.

LAW CLERK: It was in the statement that you read, but it wasn't part of the actual questionnaire.

THE COURT: Right, but we sent that questionnaire out to counsel –

LAW CLERK: Yes.

THE COURT: -- for review? And I can just, at this point, without – it's appropriate, I think, to talk about this now, because one of the questions I usually ask during the voir dire process is whether anybody's ever been or was on the jury that tried this case previously or was a witness or knew anybody that was a witness or had developed any information from that case, so that was definitely a direction I was going to go, but that bridge has been crossed in that sense, that there has been disclosure made to these folks that there was a trial and a reversal and a remand for a new trial.

MR. ROARK: Well, I'm very concerned about that, because the jury has, in effect, been told that my client has previously been convicted.

THE COURT: They were told there was a prior trial and a remand. The word "convicted" was never used.

MR. ROARK: The word "convicted" may not have been used, but I don't know any reasonable inference that the jury could otherwise

draw.

| | |
|---|---|
| THE COURT: | How would you propose that we ever inquire as to previous experience without ever disclosing that there was a prior trial? |
| MR. ROARK: | Well, I think it can be referred to as a prior hearing in terms of what the witnesses have to do, and that does not make it exceptional in terms of how we get around preliminary hearings and grand juries. The jurors are made aware that there was a preliminary hearing or there was a grand jury proceeding and that there is prior testimony. This is a different proposition. I mean, I was concerned, certainly, with finessing that point, and I think that can easily be done by calling it a prior hearing. It may be that either side will want to impeach a witness with an inconsistent prior statement. That would require them to bring out the transcript. But, again, if that's referred to as a prior hearing, I don't find that decidedly more prejudicial than if they were bringing out a preliminary hearing transcript or a grand jury transcript.<br><br>Here, however, the jury being told that this matter was once tried and then went to the Supreme Court where it was reversed, again, I think the only reasonable inference that any but brain-dead jurors could take from that would be that he's been convicted, and then that conjures up these paradigms of technicalities and so forth. As far as your question about how do find out whether or not these people may have served on a prior jury, I think that that's something that's relatively easy to do, because we ask: "Have you served on a prior jury?" And I think it would be very easy to say, |

"Have any of you had anything to do with this case prior to today?" Again, that does not require of them a commitment to the proposition that he has been previously convicted. I don't see how we unring that bell.

THE COURT: Well, I think that we unring it because I sent the script out before we ever came to this and asked for counsel to object, and I didn't get any objections, and so based upon that, I felt free to proceed with that script.

MR. ROARK: Well, perhaps it was because I've been in trial. I did not see the script. I can't say that it was not sent. I did not see the script. I certainly would have objected had I been here. And I know that wasn't the Court's fault. I was in jury trial. I couldn't avoid that. I would have objected. I'm very concerned about that, Your Honor.

THE COURT: Well, then, the opening comments to this panel that I make always include the statement that he's been charged; that he has pled not guilty; that the fact of a filing is not evidence; that they shouldn't draw a conclusion of guilt from the fact that a filing -- the point being this is a brand-new day, and I think that that's the way we have to proceed with it at this point is that this is a brand-new trial. This is day one. My concern is a further comment on it, then, if, in fact, there is prejudice -- and I'm not presuming that there is, although I understand the defense's concerns, any further comment on it as a topic would only, I think, serve to highlight it, and rather than that, by focusing on the fact that this is a brand-new trial and that, at this point, this man stands before them not guilty of anything, lets the jury know

where we are procedurally. I think that if there's any nuance in any of the answers to any of the questions from any of the jurors that somehow the appeal and the remand or the prior proceeding has had any effect on them, I'll just go ahead and excuse them at that point for that reason if that's—unless counsel think that's a wrong reason to do that. I'm not—I'm looking to both counsel here in whatever order you'd like to respond to my thoughts.

MR. STEVENSON: I'm okay with that, Your Honor.

MR. ROARK: Well, I'm not going to object to that, and I understand that this was inadvertent and could I see the script, by the way, because I –

* * *

THE COURT: If we could find that file. It came out attached to a minute order.

THE CLERK: What are you wanting?

THE COURT: There's a minute order that –

THE CLERK: That you did last week?

THE COURT: Yes, that went out to counsel that talked about this supplemental questionnaire proceeding.

(Clerk delivers script.)

MR. ROARK: Well, I appreciate that, Your Honor. As a practical matter, I did not return to the state of Idaho until about 8:00 P.M. on the 21st of June, and I did not -- again, I did not see that minute order. I did see the juror questionnaires later. As the Court

knows, I was in jury trial all of last week, so I certainly would have objected to that. I think it is objectionable. I think it has now tainted the jury to the extent that they have to understand that the case went up and, as the language says, it was reversed. There's also already been a conviction. Consequently, this is not like – I've had a lot of experience with hung juries where you're trying a case for a second time. More than once, I've tried cases for a third time. That's much easier for both counsel to work with because people were not convinced beyond a reasonable doubt, but they were also not unanimous in finding the defendant not guilty.

Here, the inference is that there was a jury of 12 who were convinced beyond a reasonable doubt that he was guilty. And another vexing part of that, of course, is that there's already enough notoriety surrounding this case, as I think the 11 questionnaires disclose, so -- although I know the Court is going to deny my motion, given all of the time and effort that has gone into this, I would move that this matter be vacated, that we select a new panel, and that they not be informed of the reversal and remand.

THE COURT: All right. Well, thank you, Mr. Roark. Mr. Stevenson, State have any further comments?

MR. STEVENSON: I don't agree on that. We'd ask that the Court does not grant that motion based on the very limited knowledge that this panel has formed an opinion as to his guilt or innocence at this point in time.

State's Lodging D-2, pp. 74-82.

Mr. Stevenson commented: "If there is any tainting, and I don't suggest that there could be tainting, whether or not they are automatically thinking he's guilty, but they could infer – very likely to infer that the Supreme Court found this man innocent, and they believe now he's innocent. And so, you know, I think that it weighs both ways." State's Lodging D-2, p. 78. Mr. Roark replied: "It weighs only one way logically." *Id*. He also stated that "the only reasonable inference that any but brain-dead jurors could take from that would be that he's been convicted…." *Id*., p. 76.

After a ten-minute recess, the trial court informed counsel that it had "looked at that issue again," and decided it would, at that point, deny the motion to vacate and go forward with jury selection from the current venire. *Id*., p. 82.

***A. Section 2254(d)(1) "Unreasonable Application of the Law" Analysis***

Petitioner contends that the introductory statement "set a tone of prejudice for the jury's first impression of the case," as there was no logical way to interpret the trial court's introductory statement without deducing that the first trial had ended in a guilty verdict; thus, "the jury pool was impermissibly tainted and [his] constitutional right to be tried before an impartial jury was infringed." State's Lodging F-5, p. 3.

As described above, by the time Petitioner's counsel became aware of the trial court's introductory comments, the court already had disclosed that information to the jury pool. The trial judge and counsel discussed whether the "bell could be unrung," and whether asking the jurors questions about the prior trial would cause more harm than just the single mention of it. The judge suggested that they listen for hints of bias in the jurors' answers to other questions and that any jurors who seemed biased as a result of the prior

trial information would be excused by the judge for that reason. State's Lodging D-2, p. 79. The prosecutor said, "I'm okay with that, Your Honor." Defense counsel said, "Well, I'm not going to object to that." *Id*.

At least 230 members of the jury venire were involved in voir dire for the 12 seats on the jury. *Id*., pp. 259-60. The trial court instructed the jury panel as follows:

> To each of these charges or counts, the defendant has pled not guilty. You must not consider the fact that a charge has been filed against the defendant to be evidence of guilt. It is not. You must not be influenced by the fact that a charge has been filed. Under our law and system of justice, every defendant is presumed to be innocent. Please do not volunteer any information beyond the specific question that's posed. If there is something concerning the question posed or your answer that causes you to wish to explain further outside the presence of your fellow prospective jurors, please tell me, and we will arrange for that to occur. The process basically is that we'll adjourn to a separate room in the courthouse with a limited number of persons present.

*Id*., p. 101.

During voir dire, the court and counsel were free to probe and try to remediate any perceived juror bias about the judge's preliminary comments. Petitioner's counsel spent a great deal of time questioning the jury about the importance of presuming the defendant innocent and of relying only upon evidence received at trial—two topics closely-related to the fact that a prior verdict had been reversed and remanded for a new trial:

> MR. ROARK: "Is there anyone here who feels that Mr. Johnson is guilty before the evidence is produced today? Does anybody feel that way? I see no hands."
>
> * * * *
>
> MR. ROARK: Now, you were present in the courtroom

| | |
|---|---|
| | yesterday when you heard the judge read the instruction that Mr. Johnson is presumed innocent? |
| JUROR 187: | Yes. |
| MR. ROARK: | And you also heard the judge read the instruction that Mr. Johnson is to be presumed innocent unless and until the State provides enough evidence so that you can say beyond a reasonable doubt he's guilty? |
| JUROR 187: | Yes. |
| MR. ROARK: | Correct? |
| JUROR 187: | Correct. |
| MR. ROARK: | So far we haven't heard any evidence. |
| JUROR 187: | None. |
| MR. ROARK: | So as you look here at Mr. Johnson 16 right now, is he guilty or not guilty? |
| JUROR 187: | Don't know. |
| MR. ROARK: | How about that, Mr. Ames? Is he guilty or not guilty as he sits before you? |
| JUROR 101: | Right now? |
| MR. ROARK: | Right now. |
| JUROR 101: | Not guilty right now. |
| MR. ROARK: | And why is that? |
| JUROR 101: | Because none of the evidence has been presented yet. |
| MR. ROARK: | And he's presumed innocent; right? |

JUROR 101: Yes.

MR. ROARK: And he will remain innocent unless and until these gentlemen can give you enough evidence that you can say, beyond a reasonable 6 doubt, he's guilty. Is that correct?

JUROR 101: That's correct.

MR. ROARK: How about that, Mr. Russmann? Do you agree with that?

JUROR 188: 100 percent.

MR. ROARK: So even though you haven't heard any evidence, right now this man is not guilty?

JUROR 188: That's correct.

MR. ROARK: And will remain not guilty unless and until the State can prove –

JUROR 188: That's correct.

MR. ROARK: –his guilt beyond a reasonable doubt. Does that seem fair to you?

JUROR 188: Yes, sir.

State's Lodging D-2, pp. 371, 403-405.

The voir dire answers evidently satisfied the court, Mr. Stevenson, and Mr. Roark that none of the jurors should be further questioned in camera about whether they could, should, or would consider the outcome of the prior trial. Both attorneys passed the jury for cause. State's Lodging D-2, pp. 397, 432.

After being convicted in the second trial, Petitioner raised this claim on direct

appeal. Therefore, Claim One has been properly exhausted in the state court system and the decision of the Idaho Supreme Court is entitled to AEDPA deference in this matter.

The Idaho Supreme Court addressed Petitioner's claim in a three-fold manner: (1) it "h[e]ld that this comment did not create an implied bias among the potential jurors that deprived Johnson of a fair trial"; (2) it determined that because Petitioner's counsel "failed to timely object, either in writing or during the jury questionnaire process, the claim was subject to—and failed under—"the fundamental error standard"; and (3) it concluded that, "[e]ven if Johnson could establish an implicit bias, he waived any claim that the jury was biased when he passed the jury for cause at the conclusion of voir dire." State's Lodging F-5, pp. 4-7. The Idaho Supreme Court denied all of Petitioner's direct appeal claims and affirmed his convictions. State's Lodging F-5.

Justice Jones dissented:

> In the present case, the majority holds that the district court's comment that Johnson's case had been reversed and remanded is not the equivalent of disclosing a prior conviction. I disagree and firmly believe that the district court's disclosure that the case was "reversed" goes beyond mere mention of a prior trial, but conveys to the jury that the defendant had been previously convicted. To presume otherwise would be to infer that the jury believed it was possible to reverse an innocent verdict.

*Id.*, p. 24 (Jones, J., dissenting).

On federal habeas corpus review, Petitioner cannot prevail unless he shows that the Idaho Supreme Court's opinion is contrary to or an unreasonable application of United States Supreme Court precedent. The United States Court of Appeals for the Ninth Circuit has taken the position that there is "no clearly established federal law regarding the issue

of implied bias," and that the United States Supreme Court has never "explicitly adopted or rejected the doctrine of implied bias." *Hedlund v. Ryan*, 854 F.3d 557, 575 (9th Cir. 2017) (citing *Fields v. Woodford*, 309 F.3d 1095, 1104 (9th Cir. 2002)), *amended by* 315 F.3d 1062 (9th Cir. 2002).[1] Respondents argue that *Hedlund* forecloses Petitioner's claim. Nevertheless, the Court will analyze the claim under existing United States Supreme Court cases that are similar to Petitioner's facts.

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a defendant the right to an impartial jury in all criminal prosecutions. *Morgan v. Illinois,* 504 U.S. 719, 727 (1992). The impartiality of a juror may be challenged for "actual or implied bias." *United States v. Wood*, 299 U.S. 123, 133 (1936). *Actual bias* is "bias in fact." *Id*., p. 133. *Implied bias* is "conclusively presumed as matter of law," or in other words, it is a bias that is "attributable in law to the prospective juror regardless of actual partiality" based upon the existence of specific facts. *Id*. at 134.

Here, Petitioner relies on *Leonard v. United States*, 378 U.S. 544 (1964) (per curium), where the United States Solicitor General admitted in briefing:

> The procedure followed by the district court in selecting the jury was, in our view, plainly erroneous. Prospective jurors who have sat in the courtroom and heard a verdict returned against a man charged with crime in a similar case immediately

[1] Other courts disagree. *See Uranga v. Davis*, 893 F.3d 282, 288 (5th Cir. 2018) (recognizing circuit split on the issue). *See also Brooks v. Dretke*, 444 F.3d 328, 329 (5th Cir. 2006) (finding the implied bias rule clearly established, observing that the "pedigree of the implied bias doctrine has … old[] origins") (citing *United States v. Burr*, 25 F. Cas. 49, 50 (D.Va. 1807) (Marshall, C.J., riding circuit) (stating that even with individuals under the influence of personal prejudices who state an ability to serve as fair and impartial jurors, there are circumstances in which "the law will not trust him")). *See also Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir. 1998) (en banc) (describing the implied bias doctrine as "the antithesis of *Teague* [*v. Lane*, 489 U.S. 288 (1989)]" and as "a rule so deeply embedded in the fabric of due process that everyone takes it for granted")).

> prior to the trial of another indictment against him should be automatically disqualified from serving at the second trial, if the objection is raised at the outset.

*Id*. at 544-45.

The Supreme Court agreed. Leonard was convicted by different juries in separate consecutive trials of related charges of forgery and transportation of a forged instrument. The jury in the forgery case announced its guilty verdict in open court in the presence of the jury panel from which the jurors for the transportation-of-a-forged-instrument case were to be selected. Leonard's objection to selecting a jury for the second case from these members of the same panel was overruled. The jury that found petitioner guilty in the second case contained five jurors who had heard the verdict in the first case. *Id*. at 544. Upon the Solicitor General's concession, the United States Supreme Court vacated the conviction and remanded the case for a new trial.

After *Leonard*, the Supreme Court has required sufficient record development about any bias claim—in voir dire or a post-trial evidentiary hearing—for a defendant to prevail on such a claim, which tends to support the *Hedlund* opinion that actual bias is required. The Supreme Court has not automatically disqualified jurors for "implied bias."

In *Smith v. Phillips*, 455 U.S. 209 (1982), the United States Supreme Court noted it "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id*. at 215. During the pendency of Phillips' jury trial, a juror named Smith[2] submitted an employment application for a

[2] John Dana Smith, the juror, should not be confused with petitioner Harold J. Smith, Superintendent of the Attica Correctional Facility, where the respondent, William R. Phillips, was being held after his conviction.

position as a major felony investigator in the District Attorney's Office—the same entity prosecuting the criminal case in which Smith was a juror. When Smith's application was received, office staff placed his name on a list of applicants but did not contact him and did not know he was a juror in Phillips' trial. *Id*. p. 212. Later, during the trial, the prosecuting attorneys in the District Attorney's Office learned that the juror had submitted the application; however, they did not disclose that fact to the judge or defense counsel during trial, even though there were three alternative jurors who could have taken Smith's place. *Id*., pp. 212-213.

Rather than finding an automatic, conclusive bias that required a new trial, the *Phillips* Court rejected the notion that "implied bias" could or should be found simply because of the circumstances; rather, it applied the rule that "[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury," relying on a pre-*Leonard* case, *Dennis v. United States*, 339 U.S. 162, 170-172 (1950). *Id*. at 216. In *Dennis*, the Court had rejected an implied bias claim that all government employees should have been automatically disqualified from the jury in a criminal contempt-of-Congress case because, upon accepting employment, they had sworn an oath not to be disloyal to the government. The Court noted that Dennis had been "free to show the existence of actual bias" but found that he had failed to do so. *Id*. at 167. The *Dennis* Court concluded: "A holding of implied bias to disqualify jurors because of their relationship with the Government is no longer permissible…." *Id*. at 216.

The *Phillips* Court also relied on *Chandler v. Florida*, 449 U.S. 560 (1981), where, before a trial began, the defendant claimed that the unusual publicity and sensational

courtroom atmosphere created by the planned televising of the proceedings would negatively influence the jurors and preclude a fair trial. The *Chandler* Court reasoned: "The risk of juror prejudice is present in any publication of a trial, but the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly." *Id*. at 575. Because the defendant did "not [attempt] to show with any specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them," the United States Supreme Court refused to set aside the conviction. *Id*. at 581.

Important here because of the procedural posture of Petitioner's case, the *Chandler* Court also examined the voir dire transcript:

> Although not essential to our holding, we note that at voir dire, the jurors were asked if the presence of the camera would in any way compromise their ability to consider the case. Each answered that the camera would not prevent him or her from considering the case solely on the merits. App. 8–12.

*Id*. at 581–82.

In a concurring opinion in *Phillips*, Justice O'Connor provided examples of "extreme situations" in which she thought bias would be implied. *See* 455 U.S. 209, 223-224 (1982) (O'Connor, J. concurring). Her examples included: that "the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." 455 U.S. at 223–224, (O'Connor, J.,

concurring).[3] On federal habeas review, a concurring opinion is not a holding entitled to §2254(d)(1) deference, but it is instructive in helping to determine whether the Idaho Supreme Court's decision is unreasonable.

In *Dennis*, *Chambers*, *Phillips*, and the decisions that the Court will discuss next—*Remmer v. United States (Remmer I)*, 347 U.S. 227, 229-230 (1954), and *Remmer v. United States* (*Remmer II*), 350 U.S. 377, 381 (1956)—the Supreme Court did not simply accept an allegation that implied bias existed; it required development of the record, with the burden on the defendant to prove bias and harm. *After* the probing of jurors, a court is equipped to determine whether the at-issue fact is so extreme that *no* juror could disregard it, even if the juror was confident he or she could.

In *Remmer I*, the United States Supreme Court was faced with what appeared to be an extreme situation but, even then, it did not automatically deem it "implied" bias. *Remmer* was a tax evasion case, where a third party approached a juror and offered him a bribe in return for a favorable defense verdict. The juror reported the encounter to the trial judge, who then informed the prosecutors and the FBI. An FBI agent interviewed the juror. After reviewing the report, the judge and prosecutors thought the statement was made to

[3] Similarly, the Ninth Circuit has said that it has "presumed bias on a rare occasion," based only on "close relationships or the fact that a juror has lied." *Hedlund v. Ryan*, 854 F.3d 557, 575 (9th Cir. 2017). The Ninth Circuit has also determined that bias can be conclusively presumed where a juror has "prejudicial information about the defendant himself." *See Fields v. Woodford*, 309 F.3d 1095, 1105 (9th Cir.), *amended*, 315 F.3d 1062 (9th Cir. 2002). Another presumed bias case of note is *Lane v State*, 168 Ark 528, 270 SW 974 (1925), where the court automatically disqualified a juror who had been present at the preliminary hearing of the defendant, heard the testimony of the prosecuting witness, and commented that the witness was telling the truth, even though in the hearing on the issue of his impartiality, the juror testified that he entered the jury box without any bias or prejudice that would affect the trial, and that he could, and did, try the case according to the law and the evidence.

the juror in jest and did nothing further with the information. After trial, the defendant and his counsel learned of the incident from a newspaper article. Later it was learned that, throughout the entire trial, it was not clear to the juror whether the government was contemplating prosecuting the juror for his role in the bribery attempt. *Id*. at 228.

On the facts presented, the United States Supreme Court concluded:

> We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless. The sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.
>
> We therefore vacate the judgment of the Court of Appeals and remand the case to the District Court with directions to hold a hearing to determine whether the incident complained of was harmful to the petitioner, and if after hearing it is found to have been harmful, to grant a new trial.

347 U.S. at 229–30.

In *Remmer II*, after factual development upon remand, the United States Supreme Court determined that the evidence “reveals such a state of facts that neither [the juror] *nor anyone else* could say that he was not affected in his freedom of action as a juror.” 350 U.S. at 381 (emphasis added). For example, the juror said that he was “under a terrific pressure” during the entire trial as a result of the simultaneous FBI investigation. *Id*. *After* the factual record was clarified, the Court was able to conclude that no juror could have

remained unbiased under the circumstances. This is more akin to an actual bias claim than an implied bias claim.

Finally, *Patton v. Yount*, 467 U.S. 1025 (1984), a federal habeas corpus challenge to a state conviction, bears many similarities to Petitioner's case. Yount, a high school teacher, confessed to police officers that he murdered an 18-year-old female student. He was convicted of rape and murder by jury in a highly-publicized trial. His conviction was overturned on *Miranda* grounds on appeal. *See id*. at 1029–30.

Four years after the first trial, the jury was selected for the second trial, and he was again found guilty. The United States Court of Appeals for the Third Circuit overturned the second conviction on the following facts:

> The voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box.... Finally, the Court of Appeals found that 8 of the 14 jurors and alternates actually seated admitted that at some time they had formed an opinion as to Yount's guilt. The court thought that many of the jurors had given equivocal responses when asked whether they could set aside these opinions, and that one juror, a Mr. Hrin, and both alternates would have required evidence to overcome their beliefs. The court concluded that "despite their assurances of impartiality, the jurors could not set aside their opinions and render a verdict based solely on the evidence presented."

*Patton v. Yount*, 467 U.S. 1025, 1029–30 (1984).

The United States Supreme Court disagreed with the Third Circuit's conclusion and reversed that court's conditional granting of the writ. The Supreme Court's reasoning applies to the facts of Petitioner's case—in both cases, extensive voir dire was the key to probing juror bias where jurors knew (or here, potentially knew) of an earlier guilty verdict

being overturned on appeal:

> There are good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions. First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning, *e.g., United States v. Burr*, 25 F.Cas. No. 14,692g, p. 49, 51 (CC Va. 1807) (Marshall, C.J.), usually identifies bias. Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference." *E.g., Bose Corp. v. Consumers Union of U.S., Inc*., 466 U.S. 485, 500 (1984). The respect paid such findings in a habeas proceeding certainly should be no less. *See Marshall v. Lonberger*, 459 U.S. 422, 434–435, 103 S.Ct. 843, 850–851, 74 L.Ed.2d 646 (1983).
>
> Thus the question is whether there is fair support in the record for the state courts' conclusion that the jurors here would be impartial. *See* 28 U.S.C. § 2254(d)(8). The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.
>
> The voir dire examination of juror Hrin was carefully scrutinized by the state courts and the Federal District Court,

> as he was challenged for cause and was a member of the jury that convicted the defendant. We think that the trial judge's decision to seat Hrin, despite early ambiguity in his testimony, was confirmed after he initially denied the challenge. Defense counsel sought and obtained permission to resume cross-examination. In response to a question whether Hrin could set his opinion aside before entering the jury box or would need evidence to change his mind, the juror clearly and forthrightly stated: "I think I could enter it [the jury box] with a very open mind. I think I could ... very easily. To say this is a requirement for some of the things you have to do every day." App. 89a. After this categorical answer, defense counsel did not renew their challenge for cause. Similarly, in the case of alternate juror Pyott, we cannot fault the trial judge for crediting her earliest testimony, in which she said that she could put her opinion aside "[i]f [she] had to," rather than the later testimony in which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have. *Id*., at 246a, 250a–252a. Alternate juror Chincharick's testimony is the most ambiguous, as he appears simply to have answered "yes" to almost any question put to him. It is here that the federal court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty.

*Yount*, 467 U.S. at 1038–40.

As to the factual development in Petitioner's case, the Idaho Supreme Court observed:

> Johnson's counsel also had the opportunity to explore and/or rehabilitate the potential bias held by the jurors by conducting detailed voir dire regarding the issue…. Such bias was not self-evident on the record before the trial court, and counsel's decision not to question the jurors about the prior trial, albeit tactically supportable, precludes a finding that the jury panel was impliedly biased in this case….Given such opportunities, which counsel chose not to explore, the district court's advising the jurors of the prior proceeding did not create an extreme situation where the jury is not susceptible to rehabilitation through further questioning.

State's Lodging F-5, p. 7.

What Petitioner's counsel *did* do was to carefully and thoroughly probe the jury about closely-related topics. He found no grounds for bias regarding the jury's understanding that, at the start of the second trial, the defendant must be considered innocent until proven guilty and that only evidence brought forward in the second trial could be considered when determining his ultimate guilt or innocence. This course of action was consistent with the predetermined plan to check the jurors for signs of bias related to having heard the "reversed and remanded on appeal" language during questioning but not to directly question them about the judge's prefatory comments unless necessary. The record contains no juror answers that suggest the prefatory comments had affected the jurors' understanding that nothing but evidence presented in the second trial was to be considered in determining guilt or innocence. There is no evidence in the voir dire transcript showing that, if there was taint, the jurors were not rehabilitated by Petitioner's counsel's careful probing of closely-related juror obligations. In short, the voir dire transcript reflects that Petitioner's counsel had *good reason* to pass the panel for cause.

The Court concludes that the Idaho Supreme Court's decision as to Claim One was not contrary to, or an unreasonable application of, existing United States Supreme Court precedent. The trial judge's statement that the case had been previously reversed and remanded on appeal does not belong to the category of factual scenarios upon which all reasonable jurists would agree is so extreme and prejudicial that it automatically constitutes implicit bias. The trial court's statement did not mention a guilty verdict or a conviction.

There is no precedent showing that laypersons equate this type of a statement to a "conviction," or, if they did, that they could not be rehabilitated in voir dire because they also know that appeals and new trials are important rights in our judicial system. There is no United States Supreme Court precedent that sanctions the automatic disqualification of jurors absent a stipulation on appeal that the trial court erred, as in *Leonard*.

Indeed, as the trial judge acknowledged in Petitioner's case, a judge *must* have a way to raise the topic of a prior trial with a new jury to determine whether any juror was involved in or heard of the prior trial. While the judge could have made the statement vaguer—such as using the term "hearing" and avoiding the "reversed and remanded language"—the words that *were* used did not conclusively inform the jury that the prior trial had ended in a conviction. Nor is it conclusive that the jurors would have drawn the connection that "reversed and remanded" meant convicted.

The bottom-line question here is "Does the record in this case show that *no person* could trust himself or herself to remain unbiased after having heard the trial court say that there was a previous trial and the case was reversed and remanded for a new trial?" The answer to that question is no. Jurors who responded in an equivocal manner to whether they could be impartial for any reason and who were not rehabilitated by further questioning were promptly excused from the panel. *See, e.g.,* State's Lodging D-2, pp. 118-214. Petitioner has an adequate record to draw from because of the extensive voir dire in his case, and it does not support his claim of actual or implied bias. Therefore, Claim One will be denied and dismissed with prejudice.

Alternatively, even if *Leonard* alone governs this case, the Court disagrees with

Petitioner that his case requires no AEDPA-barred extension of the holding in *Leonard* for two reasons. First, there is simply not enough in the record to show that the jurors *knew* that Petitioner had been convicted, whereas in *Leonard* there was no question. Petitioner's counsel argued to the trial court: "Here the *inference* is that there was a jury of 12 who were convinced beyond a reasonable doubt that he was guilty." State's Lodging D-2, p. 81 (emphasis added). But in *Leonard*, there was no room to speculate whether the five new jurors had inferred that the defendant had been found guilty; the prior jury announced the verdict in their presence. Rather, here, to find *implied* bias in the jury, the Court must conclusively *infer* that, with the jury panel having heard that Petitioner's prior trial outcome was "reversed and remanded," no juror could set aside that knowledge and decide the case free from its influence, even if they might have thought so and said so during questioning. The facts in the two cases simply are not the same.

A second factor making Petitioner's case different from *Leonard* is the lack of need in *Leonard* for the defendant to develop the facts (or argue the developed facts) underlying the asserted implied bias, because the Solicitor General did not contest the trial error. The entire *Leonard* opinion consists of a few paragraphs. Because the procedural posture of *Leonard* is different from Petitioner's case, this Court cannot assume that *Leonard* stands for the proposition that the right set of cold facts equals automatic bias. The *Phillips* Court emphasized:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it

> is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case.

455 U.S. at 217.

Similarly, Justice O'Connor stated in her *Phillips* concurrence:

> [I]in most instances a postconviction hearing will be adequate to determine whether a juror is biased. A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case.

*Id.*, 455 U.S. at 222 (O'Connor, J., concurring).

For all of the foregoing reasons, Petitioner's claim fails to meet the § 2254(d)(1) standard for relief even under *Leonard* alone.

***B. Section 2254(d)(2) Unreasonable Factual Determination Analysis***

Petitioner also asserts that the Idaho Supreme Court made an unreasonable determination of fact under 28 U.S.C. § 2254(d)(2) by not construing the words "reversed and remanded" in the same category as "guilty and convicted," but instead construing the words in the more neutral "prior trial and appeal" category. Dkt. 23, pp. 5-6. Petitioner asserts that the meaning is the same because a criminal case is "reversed and remanded" only when there is a conviction. On the other hand, Respondent takes a narrow view of the factfinding that occurred in Petitioner's case:

> The relevant factual determination made by the Idaho

> Supreme Court with respect to this issue involved properly recognizing what, in fact, the challenged instruction was. Here, the Idaho Supreme Court clearly recognized that the trial court informed the prospective jury pool that "[t]here was a prior trial in this case in 2006. Following an appeal, the Idaho Supreme Court reversed and remanded the case to this court for a new trial." (State's lodging F-3.) This instruction, which the Idaho Supreme Court accurately quoted, was the only relevant fact necessary to the Court's subsequent resolution of this claim.

*Id*. Construing the "factfinding" narrowly, this Court agrees with Respondent—the Idaho Supreme Court's factual finding is correct when compared to the trial transcript—that the jury pool was instructed that "[t]here was a prior trial in this case in 2006" and "[f]ollowing an appeal, the Idaho Supreme Court reversed and remanded the case to this court for a new trial." *See* State's Lodging F-5, p. 3 and D-1, p. 5.

Viewing the factfinding as encompassing more, the Court concludes that the decision is not unreasonable in context. Rehabilitation or disqualification of individual jurors during voir dire was the proper way to identify those who had contemplated allowing their opinions to be influenced by a prior jury's finding, rather than relying on their own judgment. The voir dire transcript does not contains facts supporting Petitioner's claim that the factfinding was incorrect or unreasonable.

Other courts have come to the same conclusion as the Idaho Supreme Court in reasonably-analyzed decisions. *See Brooks v. State*, 918 So.2d 181, 208 (Fla. 2005) (holding State's reference to a prior trial without disclosing the result was not reversible error) (receded from on other grounds); *Brown v. Kentucky*, 313 S.W.3d 577, 607 (Ky. 2010) (observing that "Brown does not contend that his second jury was informed of either his prior conviction or the reason for his retrial," and "[a]bsent such an express invasion of

the jury's independence, the fact that the jury may have been aware that Brown was being retried no more infringed upon his right to be presumed innocent than does the jury's awareness that the defendant was arrested, indicted, and put on trial.")

AEDPA's factfinding provision, § 2254(d)(2), mandates that a federal district court "accord the state trial court substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ... determination." *Id*. (internal citations altered).

Claim One will be denied and dismissed with prejudice. However, because this is an interesting fact pattern in light of United States Supreme Court precedent—a question upon which reasonable jurists might disagree whether reasonable jurists might disagree—the Court will issue a certificate of appealability on Claim One.

**2. Claims Two and Three**

Claim Two is that the State violated Petitioner's right against compelled self-incrimination when a detective was asked at trial, "Did you interview anyone else?" and he responded, "Tried to interview Mr. Johnson." Dkt. 1, pp. 8-9. Claim Three is that the prosecutor committed misconduct by eliciting this testimony from the detective. Dkt. 1, pp. 9-10.

Defense counsel moved for a mistrial after this testimony. In camera, the trial court asked the prosecution why it was pursuing this line of questioning with the detective. The prosecutor said, "I was simply collecting a list of who he had interviewed ... giving the jury an overview of the State's process and who they talked to...." The prosecutor explained

that the State did not plan to use the detective's answer for pre-*Miranda* silence impeachment purposes if Petitioner testified. State's Lodging D-2, p. 731.

The district court then inquired into the detective's motive in commenting on his attempt to interview the defendant. The prosecutor said that the police report indicated that the detective had contacted the defendant and asked if he could meet with him, but the defendant said that he would need to talk to that lawyer before he talked to them. *See* State's Lodging D-2, pp. 733-734. The district court then sustained the objection.

The trial court decided to defer ruling on the motion for a mistrial, give a curative instruction to the jury, and proceed with trial. The instruction stated:

> The last answer given by [the detective] is stricken. A defendant has a constitutional right to remain silent. The decision whether to exercise this right is left to the defendant. You, the members of the jury, are instructed to disregard the last answer given and to not consider that answer during your deliberations. You are further instructed that you are not to draw any inference at all from the testimony that has been stricken.

State's Lodging D-2, p. 738.

Petitioner's counsel did not object to this instruction, but stated he was "not going to join the Court in that instruction.... It's certainly not the instruction I would request." *Id*. After the State rested its case, the district court denied the motion for mistrial. *Id*. at 1085.

The Idaho Supreme Court held that the district court did not err in denying the motion for a mistrial because of the curative instruction:

> In this case, the entirety of the stricken comment was that the detective "[t]ried to interview Mr. Johnson." At no point did the prosecution encourage or invite the jury to draw any inferences from this comment. As the district court noted, the

> question the prosecution asked called for a simple yes or no answer to whether the detective interviewed anyone else. After the detective made this impermissible comment, the court granted a curative instruction which informed the jury: 1) of the right to silence; 2) that a defendant was entitled to invoke that right; 3) it was to disregard the detective's comment; and 4) to draw no further inferences from the stricken comment. There is no reason in the record to believe that the jury ignored this instruction and drew impermissible inferences of guilt from the stricken comment. It is therefore presumed the jury followed the district court's curative instruction in its entirety. We hold the events which precipitated this motion for mistrial do not represent a reversible error.

State's Lodging F-5, p. 11.

The Idaho Supreme Court also held that the State committed prosecutorial misconduct when the detective commented on Petitioner's right to remain silent. *Id*. However, because the trial court gave a curative instruction, and there is no evidence in the record to rebut the presumption that the jury followed the instruction, the Idaho Supreme Court deemed the prosecutorial misconduct harmless (using the state *Perry* harmless error standard, which mirrors the *Chapman* harmless error standard). *Id*.

The Fifth Amendment, applied to the States through the Fourteenth Amendment, prohibits the prosecutor from making any comments on the accused's silence in the presence of the jury. *Griffin v. California*, 380 U.S. 609, 615 (1965). Instances of prosecutorial misconduct are treated under different legal standards, depending on the subject matter of the misconduct. "[W]hen specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The Supreme Court has drawn an important distinction between an ordinary claim

of prosecutorial misconduct and a claim that the misconduct effectively deprived the defendant of a specific constitutional right. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). When the misconduct *does* implicate the Bill of Rights, it is subject to harmless error analysis under *Brecht*. The issue in *Brecht* itself was a post-*Miranda* invocation of the right to remain silent; thus, pre-*Miranda* invocations of the right to remain silent (which can be entitled to less protection than post-Miranda invocations) are also subject to harmless error analysis and do not require an automatic reversal.

In *Darden*, the Supreme Court considered the following factors in determining whether a petitioner has been deprived of a fair trial: (1) whether the prosecutor's arguments manipulated or misstated the evidence; (2) whether the remarks implicated specific rights of the accused, such as the right to remain silent; (3) whether the defense invited the response; (4) the instructions of the trial court; (5) the weight of the evidence against the petitioner; and (6) whether the defense was afforded an opportunity to rebut the remarks. 477 U.S. at 181-82.

This Court concludes that the Idaho Supreme Court did not unreasonably apply *Chapman* and that its decision is not contrary to *Brecht*, where the comment that implicated Petitioner's pre-*Miranda* silence was the detective's short, vague, not-entirely-responsive answer that he "tried to interview Mr. Johnson," particularly where the prosecutor did not encourage or invite the jury to draw any inferences from the comment, and where the comment was stricken and then cured by an adequate jury instruction. Further, where Petitioner did not remain silent but testified at trial and where the jury had the opportunity to weigh his credibility against the victim's and her mother's credibility, the short reference

to Petitioner's decision to refrain from speaking with the detective during the investigation did not amount to harmful error under *Brecht*.

The victim's mother testified that she was going to take all the children to Utah to visit her parents for the week of spring break 2004. She picked them up at the elementary school and had just buckled the seven-year-old victim in her booster seat, when Petitioner "tore around the corner and pulled in right in front of [her]." *Id*., pp. 909-910. She was surprised because he previously never came to pick up the kids and he knew they were leaving. He could not accompany them on vacation because he had to work, but "[he] got out of his vehicle, came over to the side door where [the victim's] booster seat was buckled in, opened the door and announced that he wanted to keep [her] with him and started unbuckling her seat belt." *Id*., pp. 910-911. The mother testified Petitioner said, "You don't want Daddy to be lonely, do you? You don't want him to eat cookies by himself, do you?" *Id*., p. 911.

While the victim's memory was not as clear as at the first trial, held four years earlier, there was sufficient evidence that corroborated the victim's story. The victim testified that "[m]y dad lifted me up and put me on his penis," that her "private" touched his penis, and that his penis "was straight." State's Lodging D-2, pp. 765-766. The victim also testified that her dad "put chocolate on his penis," "he made [her] lick it off because he said [her] mom does it all the time," and "[w]hite stuff came out of [her] dad's penis." *Id*., p. 762. The victim's mother testified that, when the victim arrived home, she was "[v]ery clingy, whiny, had a stomachache. Just not how she—not her normal bubbly self." *Id*., p. 931. Other changes in behavior that occurred were "headaches, bedwetting," and

"nightmares, terrible, terrible nightmares." *Id*., p. 903. The victim's mother testified that, on an occasion after the incident, the victim was scared after bathing when she thought her dad was going to see her naked; the victim them disclosed the abuse to her mother. The mother confronted Petitioner, and he explained that "he was watching a pornography movie and masturbating, and she walked in. And before he could be cleaned up and covered up and shut it off, she got an eyeful." *Id*., pp.899-901. The mother said she did not know who to believe at that time. *Id*., at 902.

A former co-worker testified that he recalled Petitioner bringing his daughter to work with him around March 2004 and that he specifically recalled that the secretary was braiding Petitioner's daughter's hair when the co-worker went to report that he was going to lunch. *Id*., pp. 588-89. The secretary testified that she did braid Petitioner's daughter's hair and entertain her when Petitioner brought her to the office, but she did not recall the time frame. *Id*., pp. 606-612. Two witnesses testified that a CARES forensic sexual abuse interview was conducted with the child and mother, but neither was permitted to testify as to the outcome of the report. *See* State's Lodgings D-2, p. 53, pp. 555-567, 568-579.

Petitioner's counsel elicited testimony from the victim's mother that bringing forward the sexual abuse allegations caused her to be able to obtain sole custody of the children and move out of state—large advantages for her. *Id*., pp. 975-977. A pediatrician testified that he saw no signs of sexual abuse on a physical examination and there was no medical evidence either to refute or support the sexual abuse allegations. *Id*., pp. 549-550.

Petitioner testified that he was not alone with the victim on March 19-22, 2004, and did not take her to work during that time frame. State's Lodging D-2, pp. 1152-53. He

flatly denied the victim's allegations. *Id*., pp. 1153-1154. He testified that his wife never confronted him about the victim disclosing the sexual abuse to her, and he never said that he was masturbating on that date as an alternative explanation. *Id*., pp. 1154-55. On cross-examination Petitioner said that "I don't believe [my daughter] thinks she's lying," and admitted that, in a prior hearing, he was not "telling the jury that she's lying in those claims." *Id*., pp. 1167-1169. Petitioner also admitted that his daughter's testimony was "not appropriate knowledge for somebody of her age," which was seven to nine years old at the time of the incidents alleged and the first hearing (trial). *Id*., p. 1170.

The State did not use the pre-*Miranda* silence against Petitioner for impeachment. Petitioner did not invite the detective's comments (weighing in his favor), and could have, but did not find the need to "rebut" the remarks (a neutral factor).

Based on all of the foregoing, the Court concludes that the detective's comments did not have substantial and injurious effect or influence in determining the jury's verdict. *See McAninch*, 513 U.S. at 436. The comment was vague, and Petitioner testified on his own behalf at trial, lessening the effect of the jury having heard that he did not cooperate in speaking with investigators before being charged with the crimes. The child testified that her father committed the acts of molestation, and said things that the mother would not have coached her to say, such as that her mother licked chocolate off her husband's penis "all the time." State's Lodging D-2, p. 762.

Other evidence admitted at trial corroborated the child's reporting of the incidents, the alleged dates she was alone with her father, and the alleged acts that occurred. In his testimony, Petitioner simply denied every detail from every witness and every piece of

evidence. The jury had an opportunity to evaluate whether the mother put the child up to the allegations to gain an advantage in the child custody proceedings, based on the child's testimony, the mother's testimony, and the father's testimony. This Court is satisfied that sufficient admissible evidence showed that Petitioner committed the crimes beyond a reasonable doubt. Therefore, Petitioner is not entitled to relief on Claims 2 and 3, and they will be denied and dismissed with prejudice.

**E. Claim Five**

Petitioner contends here, as he did on direct appeal, that the errors at trial add up to cumulative error. The Idaho Supreme Court addressed cumulative error, cumulating three errors. That court determined:

> "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *Perry*, 150 Idaho at 230, 245 P.3d at 982. "The presence of errors, however, does not by itself require the reversal of a conviction, since under due process a defendant is entitled to a fair trial, not an errorfree trial." *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998) (citing *Bruton v. United States*, 391 U.S. 123, 135, (1968)). The district court erred here in allowing a witness to improperly refresh his memory and in finding a discovery violation by the State. The State erred through the detective's impermissible comment about Johnson's silence. None of these errors left any lasting prejudice in the case. Viewing these errors in relation to the totality of the evidence presented at trial, we do not find that they were of such magnitude that Johnson was denied a fair trial. We therefore find that the cumulative error doctrine does not require reversal of Johnson's conviction.

State's Lodging F-5, p. 20.

Here, Petitioner asserts that the errors to be cumulated are that "the district court

improperly implied to the jury that Mr. Johnson had already been found guilty of these crimes and that his convictions were reversed by an appellate court; the State introduced his silence as substantive evidence of guilt at trial; and a critical witness as to opportunity was permitted to testify without a present recollection of events." Petition, Dkt. 1, p. 11.

The first asserted error was not an error, or, if it was, it was waived when Petitioner passed the jury venire for cause. The third asserted error was determined to be procedurally defaulted in a prior order. *See* Dkt. 17. A court may not consider procedurally defaulted claims in deciding a cumulative error claim. *See, e.g., Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 916 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 844 (2020) ("Cuesta-Rodriguez's ineffective-assistance claims, having been ruled procedurally barred, have no place in our cumulative-error analysis."); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (same).

Because the only error that can be considered in this analysis is the detective's comment about Petitioner's pre-*Miranda* silence, there are no errors to cumulate. Therefore, this claim will be denied.

///

///

///

///

## ORDER

**IT IS ORDERED:**

1. The Petition for Writ of Habeas Corpus is DENIED and DISMISSED with prejudice.
2. A certificate of appealability is GRANTED on Claim One—whether the trial court's introductory statement to the jury created implicit bias in the entire jury panel, requiring the trial court to grant Petitioner's motion to vacate the trial and empanel a new jury panel.

DATED: February 25, 2022

David C. Nye
Chief U.S. District Court Judge